Duer, J.
I am satisfied, for reasons that I shall proceed to state, that the plaintiff, upon the face of his complaint, has no title to the relief which he seeks, and consequently, that the temporary injunction which has been granted must be dissolved, and the motion for a permanent injunction be denied.
It is true that the learned counsel for the defendants, in the full confidence that the proceedings of the Art Union have been in strict conformity to the constitution and laws of the state, and as such would b'e sustained by the judgment of the court, has expressed his willingness to waive all objections as to the right of the plaintiff to maintain the suit—but in my opinion, the objections cannot be so waived as to deprive the court of the power, or release it from the duty, of considering them. There are numerous cases in which the eyes of a judge are not to be closed because the parties are willing that he should not see. Although in this case there can be no suspicion of a collusion between the parties, yet if the plaintiff must be considered as a stranger, having no interest which the law can recognise and protect, there is in reality no controversy, which the court is bound to determine, and still less can the plaintiff have any right to the decree which he asks, if he seeks to be relieved from the consequences of an agreement which he not only admits, but avers to be unlawful, and, by his own showing, has himself shared in that violation of the law, which, in his complaint, he has charged upon the defendants. A plaintiff is never entitled to an injunction unless it is apparent that he has some interest that may be injuriously affected by the act which he seeks to restrain, and when his claim arises from an illegal contract to which he was a voluntary party, the maxim, “ in pari delicto potior est conditio defendentis,” is the stern reply that dismisses his complaint.
The plaintiff claims as the assignee of the. share and interest of an annual subscriber to the Art Union, and the object of his complaint is to restrain the distribution by lot of the paintings and other works of art which that corporation and its managers *632 have purchased, with the funds of the subscribers, during the past year, in order that this property may be disposed of under the direction of this court, and the proceeds be distributed among the shareholders according to their respective rights and interest. The grounds upon which this relief is sought evidently are, that the subscribers and shareholders in the Art Union, in proportion to the sums which they have contributed, are the true owners of the works of art, to the purchase of which these funds have been applied, and, as such owners, may justly interfere to 'prevent the distribution of their property, in a mode, which it is alleged, that the constitution and laws of the state expressly and strictly prohibit.
I deem it needless to inquire whether the shares of the annual subscribers to the Art Union are, in their nature, transferable, but for the purposes of this opinion shall assume that the plaintiff, as an assignee, is clothed with all the rights and privileges of an original subscriber ; but it is not pretended that he stands in any better situation than such a subscriber, so as to be entitled to a relief that must have been denied to the person from whom he purchased. The simplest mode, therefore, of considering the case is to treat him as a subscriber.
The first question, then, is whether the annual subscribers to the Art Union have any right of property, any interest, legal or equitable, in the paintings or other works of art to the purchase of which a portion of the funds of the society is annually devoted ; and it is manifest, upon a very slight consideration, that this question can only be solved by a resort to the charter of the society; or, if-the charter is silent, to its constitution and by-laws. It is by no means universally true, as was quietly assumed upon the argument, that at common law individual corporators have any personal interest in the property of the corporation of which they are members. Whether they have so or not depends entirely upon the nature of the corporation. As a general rule, the whole title, legal and equitable, is vested in the corporation itself, nor have the individual members any other or greater interest than that which expressly or impliedly is given to them by the provisions of its charter, or of the constitution and by-laws, which, in the proper exercise of its corporate powers, it may have adopted. This is true, even where *633 the corporators are such by a permanent title, and it is emphatically so, when it is only by force of an annual subscription that they are corporators at all, and their rights, as such, expire with the year to which the subscription relates.
The annual subscribers to the Art Unión have presumptively no more right to the corporate property than the annual subscribers to a religious or charitable society—a bible or tract society—a dispensary or hospital. The sums which they subscribe are mere donations to be applied to the purposes for which the society is organized, unless their character as such is essentially altered by the provisions of the charter, or of the constitution, or by special agreement. To such personal benefits as may thus be held out to them as an inducement to subscribe, and in return for their subscriptions, they are doubtless entitled, but they have no proprietary right or interest in the corporate property, merely upon the ground that it was acquired with the funds which they have contributed. If they claim as owners, the charter or constitution must show that they are so.
The act incorporating the Art Union is expressed in very general terms—they authorize the association as a corporation to hold real and personal estate, and they limit the amount of its income, but they give no interest expressly or impliedly, either in the capital or income, to the members of the association.
They empower the society, by its constitution and by-laws, to regulate (inter alia) the admission of members and the annual rate of contribution to its funds, but they neither define the rights of the members to be admitted, nor state the uses to which the funds to be contributed shall be applied. For these details we must look to the constitution. The constitution, confining ourselves to those provisions, which alone have a bearing upon the case, declares that “ every subscriber of five dollars or more per annum shall be a member of the association (A. 1), “ that the funds raised by annual subscriptions shall be appropriated after defraying the necessary expenses of the association to the purchase of works of art by American artists ; and that at each annual meeting of the association the works of art, purchased during the year, shall become by lot publicly determined the property of individual members, each member being *634 entitled to one chance or share in such distribution for each five dollars by him subscribed and paid,” (Art. 8,-9). Certainly there is no recognition here; express or implied, of any proprietary right or interest of the members in the works of art purchased during the year, nor can I perceive any reason for doubting, that they remain the exclusive property of the association, as a corporate body, until this title is divested by their allotment to. individual members in the annual distribution. The contract between the association and the subscribers, as declared by the constitution, is that each of them, in return for each sum of five dollars which he shall have paid, shall acquire a single chance of becoming ultimately the sole owner of some one of the works of art which are to be distributed. It is this chance alone that the association stipulates to give and each subscriber to receive. It is this alone that he purchases, and to this only under the charter and constitution can he be entitled. If the distribution by lot for which the constitution provides is not a lottery within the intent and mischief of the revised statutes (for that it is so within their terms, it is impossible to deny), their the agreement between the association and the subscribers is lawful and valid ; it furnishes to them no ground of complaint, and no court of justice, if no fraud is alleged, can justly interpose to restrain its execution. On- the other hand, if the annual distribution is a lottery, in the full and obnoxious sense of the term, then the agreement is indeed illegal and void, but this illegality, although it may enable the subscribers to reclaim the moneys they have paid, certainly does not render them the owners, as tenants in common, of the works of art that the association may have purchased, nor authorize a court of justice to seize and confiscate the property for their benefit. On the contrary, it is an illegality, which, for such a purpose, they are not permitted to aver. If the distribution is a lottery, every subscriber, by the very act of subscription, violates the prohibition and incurs the penalties of the statute. If not the setter up of-a lottery, he is the purchaser of a ticket, and as a “particeps criminis,” has no right to be heard (Rev. Stat. p. 665, § 23). When a contract is illegal neither party, as a general rule, can invoke the aid of a court of justice, whether to enforce the contract, or to release them from' the consequences of. its entire or *635 partial execution. It is true, that the purchaser of a chance in an illegal lottery, by a special provision in the statute (1 R. S. p. 665, § 25), creating an exception from the general rule, may recover back the sum that he has paid, but it is a novel, a groundless, and an extravagant supposition that such purchasers can follow the property in which the moneys which they have paid may be invested, and require it to be sold under the direction of a court of justice for their common benefit. It is possible, that the shareholders in the Art Union may be entitled to the remedy which the statute gives, but if so, to that remedy they are confined. In a suit like the present, they have not a “ locus standi injudicioThe necessary conclusions are, that if the Art Union distribution is not a lottery within the meaning of the statute, it cannot be enjoined ; if it is, it cannot be enjoined upon the application of all or any of the shareholders.
Nor is it upon these grounds alone that I place my decision. Let it be admitted that the subscribers to the Art Union have, at least, an equitable interest in the works of art that the association may purchase, not only this equitable interest, if the allegations in the complaint are true, but the legal title of the association itself, before this complaint was filed, had ceased to exist. The entire property, if the annual distribution is a noxious lottery, before the complaint was filed, was, in my judgment, vested in the state. It was so vested by force of the forfeiture which the statute declares, of “ all property that shall be offered for sale or distribution contrary to its provisions”— a forfeiture which, by the express words of the law, may attach as well before as after the determination of the chance upon which the distribution depends (Rev. Stat. p. 666, § 31).
It has, indeed, been insisted by the counsel for the plaintiff, that the forfeiture which the statute creates, whatever may be its effect by relation, does not attach, so as to divest the title of the owner, until by a proper judgment in a suit instituted for that purpose, the rights of the state have been established; but although it is undoubtedly true that a forfeiture at common law does not operate to change the property until ..some legal step has been taken by the government for the assertion of its rights, there is a material distinction between a fiommon law and a statutory forfeiture, to which the learned counsel failed to advert. *636 “ When a forfeiture is given by statute (they are the words of Chief Justice Marshall, that I quote), the rules of the common law are dispensed with, and the thing forfeited may either vest immediately or upon the performance of some future act, according to the will of the legislature. "This depends entirely upon the construction of the statute.” (United States v. Grundy, 3 Cranch, 33.)
It was not the habit of Chief Justice Marshall to support the positions which he advanced by a reference to authorities, but there are many decisions in England and in the United States, which establish that where by the words of a statute a forfeiture is attached to the commission of an offence, its immediate operation is to divest wholly the title of the owner, so as to deprive him of the right of maintaining any action or defence, to,which, as owner, he would otherwise be entitled. To a few of these decisions, I shall briefly refer.
In the case of Wilkins v. Despard (5 Term. R. 112) the action was brought by the owner of a vessel and cargo against the governor of an English colony, for seizing and converting the property to his own use. The defence was, that the property before its seizure, by a breach of the navigation act, had become forfeited to the government, but it was not alleged that it had been condemned, nor denied that it had been converted by the defendant to his own use.
To the plea, setting up this defence, there was a general demurrer, which the court of king’s ■ bench overruled, upon the ground, chat by the forfeiture, which the demurrer admitted, the title of the plaintiff was divested, and consequently that it was immaterial whether the conduct of the defendant in not proceeding to a condemnation was justifiable or not. As the plaintiff was not the owner at the time of the seizure, he had sustained no loss that he could be entitled to recover. In giving his judgment in this case, Lord Kenyon referred to a former decision of the king’s bench, in the time of Lord Holt, as a conclusive authority. The case so referred to, is Robert v. Witherhead (Salkeld, 223, S. C. 12, Mod. 92). This was an action of detinue for the recovery of goods alleged to be forfeited by a breach of the revenue laws ; and the question was, whether the action would lie. It was admitted that this action, *637 like that of trover, supposes an antecedent right of property, and it was held, that it would lie, upon the ground that the act inducing the forfeiture made an immediate alteration of the property. The very words of one of the judges are, that “ the property was divested out of the owner by the act of importation.”
I pass now to the cases in our own courts. The earliest, perhaps, is that of The Mars (1 Gallison, 192), in which Judge Story, in a very elaborate opinion, maintained an opposite doctrine to that which I have stated, and in effect determined that the construction even of a statutory forfeiture is governed by the rules of the common law. The views, however, of this learned judge (from which I would otherwise have been reluctant to dissent), were subsequently overruled, and his judgment reversed by the tribunal of paramount authority, of which he was a member. I refer to the decision of the Supreme Court of the United States, in the case of the United States v. 1960 Bags of Coffee (8 Cranch. 398).
The goods were libelled as forfeited to the government by their importation into the United States, contrary to the provisions of the non-intercourse act of 1809, but they had been entered and paid duties at the custom house, and were in the actual possession of a purchaser, in good faith, at the time of the seizure. It was admitted that this purchaser, who was the claimant, was entitled to the restoration of the goods, unless by the acts creating the forfeiture, the title of the original owner was immediately and wholly divested. If a seizure was necessary to vest the property in the United States, the intermediate purchaser was protected. The court held “ that the question rested entirely, not upon the rules of the common law, but upon the words of the act of congress, which expressly declared that the forfeiture should take place upon the commission of the offence ; that it belonged to the legislature alone to determine upon what event the title of the owner should be divested, whether upon the commission of the offence, the seizure, or the condemnation, and in the. case before them the majority of the judges were of opinion that the commission of the offence marked the period of time when the statutory transfer of the right took place.” The goods were accordingly con *638 demned. Mr. Justice Story admitted that by this decision, his own in the case of the Mars was overruled, and his judgment in that case, which was also before the court upon an appeal-, was subsequently reversed without argument.
It may possibly be thought, that, as in the cases I have cited, there was an actual seizure of the forfeited property, the judg-. ment of the court may have proceeded upon the ground that the seizure operated to divest the title of the owner,' by relation, from the time of the commission of the offence. It might be sufficient to reply that this construction is plainly excluded by the language of the judges, who, in none of these cases, make any allusion to the common law doctrine of relation; but it-so happens that there are other cases, and those in the supreme court of our own state,, the direct authority of which -cannot be evaded upon the hypothesis I have stated, nor upon any other.
Fontaine v. Phœnix Insurance Co. (11 John. R. 293), was an action upon a policy of insurance. The insurance was upon a. vessel at and from New York to St. Bartholomew, and back to the United States, with liberty on her outward voyage to touch and trade at Martinique. The vessel upon her outward voyage stopped at Martinique, discharged her cargo and took on board part of another cargo, but before her loading was completed, was cast on shore in a hurricane and totally lost. A verdict had been rendered for the plaintiff, and the case was before the court upon a motion for a new trial. The court held that the question, whether the goods taken on board at Martinique were intended for the United States,.ought to have been distinctly submitted to the jury, since if such was their destination, it was certain that the plaintiff could not be entitled to recover. That the act of taking goods on board with that intent was a violation of the provisions of the non-intercourse act, and worked by force of those provisions an immediate forfeiture of the vessel, and it therefore followed, if that intent was proved, that the plaintiff had no insurable interest when the loss happened ; he had then ceased to be the owner of the vessel, and was no longer the party assured. Upon this ground a new trial was granted, and in the subsequent case of Kennedy v. Strong (14 John. 129), Chief Justice Thompson, referring to this decision, and to the language of Chief Justice Marshall in the. United *639 States v. Grundy, said that the law was settled “ that a statutory forfeiture takes place on the commission of the act prohibited, and that by the forfeiture the property is immediately divested out of the owner, before any seizure or suit.”
It cannot be said that there is any difference between the words of the non-intercourse act and those of our statute in relation to lotteries, that can lead to and justify a different construction. Those of the act of congress are, “ that whenever any articles, the importation of which is prohibited by this act, shall be imported into the United States after the 20th day of May next, all such articles shall be forfeited to the United States.”
Those of the statute, “ all property so offered for sale, distribution or disposition against the provisions of law, shall be forfeited to the people of this state.” The forfeiture, in the first case, attaches upon the importation ; in the second, upon the offer; and if in the first it works an immediate change and transfer of the title, such must be its necessary effect in the latter.
If the intended distribution, which I am asked to enjoin, is, in any criminal sense, a lottery, it is the property of the people of the state that this court is required to take into its possession, and dispose of for the benefit of the shareholders in the Art Union. It is not probable, that we shall soon venture upon such an exercise of our jurisdiction.
In the observations that I have made, I have been careful to abstain from expressing or intimating any opinion upon the main question, lottery or no lottery, which was so ably and zealously debated by the counsel of the parties. I will not say that upon this question the arguments which I have heard, and my own reflections, have not led me to form a definite opinion, but whatever my opinion may be, I am satisfied that, at this time and from this place, it ought not to be declared. I must not attempt as a judge to determine a question which I have shown that the plaintiff, as a suitor, is precluded from raising. As the question is not properly before me, any opinion delivered by me now would be voluntary and extra-judicial.
Although I am convinced that this action cannot be maintained, I have no power at this time to dismiss the complaint. *640 I can do no more than refuse to continue the injunction that has been granted. It is therefore dissolved.